Okay, when you're ready. May it please the court, my name is Brian Brody. I represent Appellant Tory Partle. That's appeal specifically 17157. I plan to use about seven minutes and I'm gonna turn it over to my colleague, Mr. Steve Miller, who's representing Mark Chekchik. So you're roughly looking seven minutes and then how much time did the two of you wish to save for rebuttal? Three minutes, Your Honor. So, seven minutes, 10 minutes, three minutes saved? Okay. Yes, please, Your Honor. As an initial matter, the record supports a conclusion that Appellant Tory Partle timely opted out of the class action settlement. Her affidavit explains she followed the instructions on the settlement website to opt out and then without a response from Volkswagen or the text of the settlement website in evidence, there's simply no contradictory evidence in the record. That she could opt out online makes sense. She received an email, not regular snail mail, that had an attachment that she had to view on her electronic device. And then that directed her to a website where she could then enter her information. I thought it was common ground that the, I understand there may have been something inconsistent with it, but that the class action notice said you had to mail it in. Is that right? That is correct, Your Honor. But it also identified the website. So if there was something, you're saying there may have been something inconsistent on the website. Correct, that is one of the reasons why we believe that ultimately we're gonna be able to show excusable neglect. In fact, I only mentioned that Tory Partle believes she opted out to say that the trial court didn't make any findings one way or the other. It simply assumed that she did not opt out despite admitting it was unaware of the actual contents on the website. But as we stand here today, Your Honor, we don't think we need to remand to answer this question. We understand that the time for Volkswagen to have responded before the trial court entered its court order had not yet expired. And perhaps there could be some argument about whether the website gave some other method for opting out. But such an inquiry just isn't going to be necessary because even if this court assumes without deciding that Appellant Partle could not opt out using the website, the facts still show that her conduct was excusable and made in good faith. Ultimately, she made a motion to the district court based on excusable neglect. Federal Rule 6b can extend the time. How many days late was her actual, the complying submission? Your Honor, with apologies, it's in my brief and I don't remember. I believe that ultimately the motion was filed 14, 16 days. It's something like that, Your Honor. I think it's certainly within the 30-day. And the only reason why the motion to opt out was not filed immediately is because I had to first obtain Pro Hoc Vice had to get all the requirements in order, get that order. That order came out on a Friday and literally the Monday morning, the motion was on file. That was the soonest possible moment that it could be filed, Your Honor. This court has- What, does she have a separate lawsuit going? Yes, Your Honor, she does. I'll speak to that very briefly. We've been litigating against Volkswagen regarding this particular vehicle since October of 2013. Roughly October of 2015, Tory Pardo was granted permission in that state claim to amend it to include the clean diesel engine allegations. And we continue to actually litigate that claim even after the, before and after the opt-out date. Clearly her actions indicate that she thought she had opted out, that we intended to move forward, that she was in fact moving forward and Volkswagen knew that at all relevant times. Is there any record of her interaction with the website? There is not, Your Honor. The district court judge didn't resolve that question either. I mean, I suppose it's possible she made it all up, but he didn't say that. Correct, Your Honor. There was no ruling on that one way or the other. In fact, we noted that part of her affidavit speaks to the fact that she didn't think to retain it. Clearly hindsight is 20-20. She should have printed something out. She should have preserved a record, but we don't have it, Your Honor. Help me understand this as practical matters. Obviously she wishes to opt out. She's not satisfied with the terms of the settlement that she would obtain as a class member. What is the advantage if she's opted out that makes it so worthwhile to her that you would be standing here arguing in front of us in order to achieve that? I guess because, Your Honor, there was a lot of problems with this vehicle. It's not that she... Remember, this litigation began October of 2013. This was originally a Magnuson Moss Warranty Act claim relating to water leaks, among other issues, unreasonable number of repair attempts. She's been fighting them from the very beginning and she felt, and again, with apologies, I don't know that all of this is in the record, but obviously she felt that these would not be sufficient to compensate her for everything she went through. And then in the midst of a lawsuit, two years in, no resolution, she finds out, oh, by the way, there's these other frauds that were perpetrated upon you. She felt that she wanted the opportunity to explain, get her day in court and explain everything that happened to her with regard to the vehicle. Nothing in the settlement is affecting her other claims against... Certainly that would be our position on her, yes. So it makes it even harder for me to understand the answer you just gave me as to why it is worth it to her to have you stand here saying she wants to opt out. I will say this, Your Honor, that the answer to the question has not actually been litigated. There is certainly... The release does, sorry, this class action settlement does contain a release and it is not necessarily obvious that her other claims would be on effect. Now, this may be really off to one side, but I'm nonetheless curious. Assume that her other claims about the water pump and whether other problems with the, I'll call it a lemon for purposes of just summary, are allowed to go forward. What's the maximum she can recover? And she's now outside the class action settlement, so everything she recovers is maybe some version of the class action settlement due to the diesel and then something related to the water pump or whatever the other things are. What's the maximum she can realistically expect? Your Honor, the only reason I'm struggling to answer the question is I don't know if offset in any way, shape, or form would apply. I guess, assuming that there's no offset relating to a class action settlement, she could recover the full amount, well, it's the difference in value with the time and place of purchase between what she had paid and what she, the value of the vehicle she had actually received, plus, perhaps, any out-of-pocket incidental consequential expenses. Yeah, okay, I'm still puzzled. I mean, it doesn't make any economic sense to me unless you're working for free. I'm not, Your Honor, but I guess, to that point, the only thing I can really say is, if we don't opt out, it seems like some arguments are going to be made, and I realize that it's specular, but I think we qualify under Rule 6b, based on the excusable neglect standard. But the idea is, if we don't, then we are going to have to litigate, I suspect, all of these questions unless we get a stipulation from Volkswagen, right? Is there an offset? What about the vehicle? If she returns the vehicle through the opt-out, does she get, what value did she get? Otherwise, she could keep it. There might be some trade-in value. I don't know, Your Honor, but it feels like we're going to have to re-litigate those same questions again, even if I win and get everything she wants in the state court. I don't know if she's going to get to keep it all, Your Honor. Okay, and did you want seven minutes?  I'd like to give Mr. Miller a chance. Thank you, Your Honor. Good afternoon. May it please the court. My name is Steve Miller. I'm here on behalf of Mark Chechik, who is an appellant and member of the class. Ooh. Um, I think we all have that sentiment. Um, the issue, there are a couple of issues that relate to Mr. Chechik. He has objected to the manner in which the district court has been able to handle the class action settlement. The district court elected to bifurcate the process, and instead of, in the view of Mr. Chechik, following Mercury Interactive, which required the filing of the attorney's fee application before the fairness hearing, the district court had the fairness hearing without that fee application. There are two appeals pending now. This appeal on the merits of the settlement, and there's a subsequent appeal, which we're a party to, on the attorney's fee award. And indeed, the attorney's fee award that was rendered by the district court was rendered on the very day the briefs were due in this appeal. It's caused concern, I believe, in this circuit, because Mercury Interactive has been an important precedent, particularly in this circuit, about how to proceed in the class action settlement. Another problem that has arisen, which is an issue predominantly in the second appeal, is that when the district court had the fairness hearing- But there were two things here that I understand distinguish Mercury Interactive. One is that there was a statement made as to the maximum fees that could be obtained. Correct. So somebody wanted to object and thought that was too much, they could do it. And in fact, the actual fees obtained were half of that amount. Correct. So they certainly had a pretty good clue, as to the, in fact, a inflated view of what the likely fee award was. Well, let me- And secondly, just to finish, my understanding is that in Mercury Interactive, there wasn't going to be a time to contest the fee award. I'm sorry. In other words, in Mercury Interactive, there wasn't a second opportunity to challenge the fee award, there was here. Yes, okay. Let me- That's a big difference. Well, there's another fact that I think we need to put on the table. The notice that was sent to the class, the long-form notice does not discuss amounts of fees. That $324 million fee notice was put in the record after the notice was sent out to the class. It's not in the notice sent to the class. And then the district court had the fairness hearing on the merits and said, we will notify the class when the fee application is made. It is position to Mr. Chechik that that notice never occurred that the court rendered its decision on the fee application without notice. Well, it was put on the website and people were told to check the website. I understand you think that's inadequate and- That's one of the key issues for this court. And this court, meaning maybe the second panel, is, is it now going to be the procedure in the Ninth Circuit that all you have to do is create a settlement website and put your information on the website and not introduce it to the public? Keep in mind that when this case was filed, there were two forms of notice given, email to prospective consumers and first-class mail, which has always been the tradition in all the circuits. Class counsel is arguing that, at least with respect to the fee application, all they have to do was, as Your Honor just pointed out, post it on the website. Well, does that mean then that we're moving toward this model? I mean, I'm not debunking your argument that there's some issue there, but you, but it was after the class, in the class notice was told to check that website frequently, right? That's true. Is that correct? That's true. And so the question is, is that adequate notice for nationwide class actions? People who don't check websites, people, and now we put shift and put the burden on the class members to actively check, how often are they supposed to check the website? Once a month, once a week, once every three months. The burden has always historically been on a class counsel and the defendants to notify the class. And I think, we think that there is a dangerous, the precedent being set in this case, is it shifting from Mercury Interactive in some fashion? So now the burden becomes on the class members to have to keep up with notice? Or is that the direction we're going? Is it also the direction that now you can file a class action in the Ninth Circuit and not have to give direct notice to a class at all by the traditional methods that have been honored before? You just set up a website and post your motion and that's good enough? We suggest it's not. We suggest that this case is leaning toward a precedent that is changing the course of Mercury Interactive by the way that the court handled both the merits and the attorney's fee. And it's also leaning away from the due process rights of class members to receive reasonable and fair notice. And that posting on a website is not that notice. There's also another issue, I don't know if the court wants to take it up, where a motion has been filed saying that my client, because he accepted the benefits of the settlement, does not have standing to make these arguments. That has to be right. Why isn't that right? Because that defeats, that's another thing that is happening in this case that defeats the rights of class members to object. I don't understand that part. What's the last date by which he could accept it? It's two years out. It hasn't run. Exactly. There was no reason he had to accept it. Except that in this circuit, it's our understanding that you have to file a claim to have standing to pursue an objection. And that's what he did. You don't have to file a claim, but you don't have to accept a settlement. They're different, right? Well, why would you file, except that the purpose of filing the claim is to put you in the process for accepting the settlement. But you don't have to sign off on the settlement. You signed off on the settlement and waived his rights. If he waived his rights, what's he doing here? Well, that's an issue, too, in this circuit, is now are we going to see in class action settlements this device that's being employed in this case that I've never seen before, where you file a claim to be in compliance  pursue your objection, and then you're presented with the settlement. Do we have any case that allows somebody who has actually signed the settlement and waived his rights to continue to object? Yes, let me point out. Do we have a case like that? I'm sorry, I didn't hear you. Do we have such a case? No. With somebody who has accepted the settlement. Presumably, he has his money. No, this is a person. He has his money, and. This is a case of person pressure. Doesn't have his car anymore. No, he does not. Let me point out another thing, though, about the settlement, Your Honor. Let me point out about the settlement. In the settlement, he released the released parties. Would he be precluded from objecting if he had not signed the settlement? We have several other people here who didn't accept the settlement, and filed an objection. We have some, I believe. I don't know a lot. Right, I didn't say a lot, I said some. I need to make another point about the facts. His release is an exhibit to class counsel's motion. He released the released parties. It's not defined in the release that he signed. If you go to the settlement agreement, section 9.2, it's the Volkswagen parties. He's also raising an objection about his 23H rights to object to the attorney's fees. Class counsel is not a released party in the settlement, and he did not release his Rule 23H rights to pursue objection. Well, that's probably true, and he probably can go ahead with the objection to the fees, but that's not this case. That's true. Right. That's true. So what's the problem? This case is bifurcated. So what's our problem? One of the reasons I'm here today is to make sure that this panel understands that, I don't mean, I'm just not trying to be insulting, that this panel understands that another panel is going to be taking up a vital issue in this case. Yes, we understand. Is that the end of your argument? That what? So now you've achieved that, and so your client has no other problem. Maybe you need to sit down. I'll sit down. Your Honor, I don't want my client prejudiced in the second case. That's one thing that I have concern about, is that you make a ruling in this case that prejudices his standing in the second case, just based on the argument that I just gave you. I'm sorry, Your Honor.  I just understand that. He has accepted the settlement. The settlement didn't have a fee provision in it, an amount of fees. That's right. I mean, I don't think we have to say anything about it. It's up to the next panel, which could be this panel. I don't know, but in any event. The other issue I want to point out, and then I will sit down, is that we've raised the issue about the perverter, and the court applied the standards of Bluetooth, said it did, without the benefit of the fee application. And so we question whether the court really did a comprehensive evaluation of the perverter issue, and whether, and it seemed to us that any money that's left. It appears that the panel, that the, you mean because Volkswagen's going to, because the fee application was for less than you thought it might be? Is that why?  So the question is, is how does the court, under Bluetooth, sufficiently and comprehensively, under the law of the circuit, evaluate the perverter without the fee application in front of it? Because the court's supposed to be looking for collusion, among other things. The other question is, is that, so why couldn't the settlement have? This is an almost unique class settlement, isn't it? Yes. Where, just a minute, where the class members got everything they could possibly be entitled to, plus. They've gotten a lot. I'll agree to that. Yeah, I mean, the reverter cases we've got tend to be cases in which the class members get trivial amounts of money. And this is quite the opposite from that case. So I'm having trouble with the strength of the reverter argument, I have to say. Okay, well, I appreciate that. I'm raising, though, I believe, very important issues about the process, Mercury Interactive, the bifurcation, the application of Bluetooth. And those are, because I believe that this case is setting precedent for a change, arguably a change in the way class actions are handled, the notices are handled, and the decisional process is handled. And it's our view that that is to the detriment of class members. Okay, thank you. Thank you. You've used virtually all your time. You've got six seconds left, but we will give you, let's say, two minutes for response. I may not need it. Yeah, yeah. Good afternoon, Your Honors. Elizabeth Cabraser for the Plaintiff's Appease, the settlement class. I would note, with respect to Appellant Partle, Ms. Nellis will be addressing that issue on behalf of Volkswagen with three minutes, and I would like 17 minutes. So you do 17, and then Ms. Nellis, three. If it pleases the Court, Your Honor. Of course, fine, yeah. I think to start right off the bat, where it's most relevant. Can I just ask for a clarification? Yes, Your Honor. My understanding is that although the client in the last case, the last argument, may not be properly before the Court, there are people before the Court as objectors who are making the same argument, substantive arguments. Is that right? There are a few. The motion to dismiss that we have on file deals with six of the appellants, including Mr. Chechik. Right. And actually, there are two additional appellants, the Seewerts, who would be subject to the next motion to dismiss that we file because we've now learned that one of them got his car fixed and was paid, the other completed a buyback and was paid, and both signed the releases. So at this point- I'm just trying to isolate whether there are still people before us who are making, essentially, the argument, substantive arguments, that Mr. Chechik argued. I think that is correct, Your Honor, with respect to Roberta, and with respect to the fees process. And to Mercury, I believe so. It's a vanishing number, and no one else here today is arguing. And I think it is important to note, with respect to that issue, that Mr. Chechik has been paid and signed a release. He got over $17,000 for his 2012 Jetta. That's about 120% of its clean retail value, as of 2015. That transaction was completed in January 17th. Mr. Chechik is one of the earliest settlers here. And I would note that the deadline to file a claim in the settlement is September 2018, long after these appeals will be resolved. So knowing this- And whether or not he can object to the fees- 2018. Do you have a, I suppose it's not in this case as to whether he can still object to the fees. But in any event, that's gonna be dealt with in the fees case. I think, Your Honor, that's right. And on the merits of that issue, the Mercury Interactive issue, of course the district court was aware of and attentive to Mercury Interactive. Mercury Interactive is mentioned in the lengthy preliminary approval order, which also conducted- Well, I understand that non-settling defendants can object to the fees. And that's the big distinction with Mercury Interactive. But whether settling defendants, plaintiffs, can object to the fees, I would think they could, but it's not before us at this point. It's not before you, but I would say, Your Honor, that in this situation, and again, we're not dealing with some theoretical class action. We're dealing with this class action and this class action settlement. In this class action settlement, of course, it was not a common percentage of the common fund award. It wasn't deducted from the class. The settling, the settlement class members have gotten their payments directly from Volkswagen. Nothing has been deducted from fees. We'll deal with that as an issue in the fees appeal. But I think it's important to note on the merits that when the class members themselves indicate satisfaction with the deal, which includes the structure of the attorney's fees, which they were all aware of, that was in the class notice, which everyone got, when they had an opportunity to object and be heard on the amount of the fees and the fee methodology and the load star and the multiplier, which they were under the procedure that the district court set following Mercury Interactive, neither standing nor merits would suggest that those are compelling claims. Again, what the district court did in this case was specific and unique to the particular circumstances of this case, which as the panel, as your honors have indicated, may be unique. But it was still governed by this court's jurisprudence on fees and fee procedure, and it was still governed and faithful to Rule 23H. Well, I must say that I find mildly troubling the fact that there was not a separate notice on the fees. It was on the website. I understand that there were, and it may be well sufficient that they were specifically told about the website. They were told to look at the website. I don't know that the, it could have been done better. Let's put it that way. Even the notice could have said the fee motion is going to be posted on the website. So if you're interested in the fee motion, you should look at the website. It didn't say that, right? It did not say that. Instead, the court repeated on the record, repeatedly repeated in his preliminary approval order, posted on the court website, posted on the settlement website, the timing, the briefing schedule, the procedure. Is that the perfect? Well, somebody could think when they said you were going to get notice of the fee motion that they meant he was going to get notice in the same way they'd gotten the other notice. Perhaps, Your Honor, someone could think that the standard here under Rule 23H is reasonable. It is not equivalent to the best practicable notice standard of Rule 23. This was a case in which, unlike most class actions, everything that happened in the case was front page news. And I'm not talking about Law 360. I'm talking about the general media front page news. It was front page news when class counsel filed their statement that they would seek a maximum of $324 million in fees. That was front page news in the general media. It was covered in the automotive magazines. It was covered everywhere. It was on the chat groups. It was the talk of the Volkswagen diesel world. Similarly, when the preliminary and final settlement approval decisions were made, those were news. When the actual fee application was filed and posted and served and put on the website, that was front page news as well. So I would say, under the circumstances of this case, particularly given the district court's unceasing efforts to make sure these were transparent proceedings, that the class members always knew what was going on, they could phone in and listen to every status conference, they were told to check the website, and where the same website was the hub of all the claims activity. That was where the action was. And there were millions and millions of hits on this website. Millions and millions, Your Honor. And where class counsel had 124-member class member response team, we also communicated with at least 130,000 class members to answer all their questions about the settlement, including questions about the fees and fee timing, and including how to get them to their Volkswagen buyback appointments on time. So this is not a case where any aspect of the settlement or the fees or the fee procedure or the deadline was anything but in plain sight, front and center, for those who were interested in the settlement. And Your Honors, this isn't a passive uninterested class where the court has to be the guardian because the class members don't know because the class members don't care. Here we can prove, the class has demonstrated, it does know, it does care. 426,456 claims, going through that same website, have been paid or approved and scheduled to be paid. The settlement has now reached the 7.761 billion mark in payments for buybacks and fixes. There have been 334,906 buybacks completed. Whether those cars are illegal or not, they are off the road, they're not being operated. And 44,000 emissions repairs have been completed or begun. Those cars, regardless of the prior argument, are legal to drive, buy, and sell. 11,401 eligible sellers have been paid. And the number of unique VINs, the number of actual vehicles that have signed up in the claims portal is over 88.6% of all the vehicles. So that concern about the 85% target, it will definitely be reached and exceeded. And by the way, the obligations under the settlement aren't that Volkswagen pay 85%, that Volkswagen pays 100%. If 100% shows up, 100% gets paid, we're doing everything we can to make sure 100% show up. And frankly, it's the economic incentives that have put the consumers themselves at work here to enforce the Clean Air Act and their own consciences by making sure these cars are bought back and off the road or fixed and operated legally. That's the best way we know to solve the problem in the real world is to put the settlement in place and to put it in place quickly. The court was very concerned about transparency and information. And that did extend to the timing of the fee and the fee process. The court followed the procedure in NFL concussion and Deepwater Horizon, two other very high stakes, high profile class actions to defer the final fee determination until everyone knew whether the settlement was real, whether Volkswagen was in compliance, whether it was operating successfully and whether there was a substantial level of class member participation. It seems to me that the uniqueness of this class action may make that process viable and valid because as Judge Fletcher said earlier, the reversion problem has little application here. But if you were dealing with a $10 coupon kind of a case and you split it up this way, it seems to me that the Bluetooth concerns about reversion would include concerns about the fees. Your Honor, I think that that is correct. I think in a $10 case or a coupon case, all of the Bluetooth factors come into high relief. And even though the Bluetooth factors were arguably irrelevant here, Judge Breyer addressed them comprehensively, both at the preliminary approval stage in his 33-page decision and at the final approval stage in his 50-page decision. In fact, Bluetooth factors have pride of place in both because this was a very careful, very conscientious district judge. And I would also say this. I think the lesson of Mercury Eractive, the lesson of Staten versus Boeing is that it's not a matter of structure, and Bluetooth too, it's not a matter of structure and one size fits all with class actions. It's a matter of function. And what would be an appropriate notice and what would be an appropriate sequencing of the fee process and how soon or how late the court should address fees and what types of notice should be given always depend on the particular circumstances of the case, which is why the proposed amendments to Rule 23, which are pending in the Supreme Court, the standing committee approved them, have gone to front-loading by providing more information sooner. Judge Breyer did front-loading and also recommend in the advisory committee notes in line with NFL concussion and Deepwater Horizon and Mercury that in many cases it may be appropriate to defer consideration of the fees until the claims rate or participation level of the settlement is known. So the district courts are being told to pay heightened attention to the particular circumstances of the case and design notices and procedures and sequences that are fairest there. And this district court spent, and I would say it was an incredible amount of time, but it wasn't incredible because it actually happened, making sure that the procedures here fit the case and fit the class. If this had been a class that was not active, not engaged, not involved in claims over an important and emotional investment like a car, yes, I think that the structure of the settlement, the type of notice, the amount of fees sought, the way fees were structured could have been very different, but that would have been a different case and a different settlement. And I think what the jurisprudence of this court teaches that each class action settlement must be evaluated first by the district court as fair, adequate, and reasonable under its own circumstances using the Hanlon and Churchill factors with heightened attention under Bluetooth if it's a simultaneous settlement and class certification. And if there are appeals, that the circuit court also be attentive, but also be deferential to the broad discretion that a well-informed and conscientious district court has over the management and resolution of the cases entrusted to him. And finally here, I think the class has decided the merits and the value of this settlement. You know, it's a truism to say in every case, it's the class that decides what the class settlement is worth and whether it's a good one. Here, we are at 95% participation by this class. I wouldn't be surprised to see us reach 100% participation. It's unprecedented. No one is forcing these people to participate. 88% have filed claims, is that what you're saying? 88.6% of unique vehicles. There are actually more claims than that because many cars have more than one owner. And so there are actually over 500,000 claims. Your honors, all the statistics on where we are- But if you don't mind my interrupting, the question really was, we somehow jumped from 88% to 95%. How'd that happen? That happened because 88% are vehicles, but vehicles have had multiple owners. This is a former owner plus current owner class. And there's going to be more than one person per car. That's right, more than one person per car. These statistics are on the district court's website under a special section that has all the claims administrative reports. I'd like to ask one question. Yes, your honor. Briefly, which is, we're about to hear from Ms. Partell's lawyer. You taking a position on her opt-out? Your honor, I- She's a member of your class, I think. She is a member of the class. I don't know the details of that scenario. I will say this. If she has other problems with her car that are not TDI matter related, the class release does not stop her from pursuing those claims. She can have the best of both worlds. She can participate as a class member, do a buyback for at least 112.6% of the September 2015 clean retail value of her car, whether her car is clean, average, or rough, because under the settlement, all cars are cream puffs. And she can pursue the Lemon Law claims that she has. So I don't see, based on what I know, an inequity here. Obviously, the right to opt out is an important one. It was exercised here. It was meaningful here. I don't know why she didn't do it on time, but I do know that the settlement work will compensate her very, very well and doesn't prevent her from pursuing her other non-emissions related claims. Thank you. Thank you. Ms. Cabreja sought to reserve three minutes. Let's bump it up to three. Thank you, Your Honors. Sharon Nellis from Sullivan and Cromwell, again, on behalf of the defendant, Apple Lee's Volkswagen Group, thank you for having me back. I will address Ms. Partle's argument. Precisely because we can't figure out why she wants to do this, we can't figure out why you care. Yes, Your Honor. As has been noted, Ms. Partle's request for relief to the district court was denied before Volkswagen responded. I do believe, and endorse, what I believe the district court has done very successfully in this case, which is to manage a very complex structure in a way that has allowed it to be as successful as it has been. Ms. Partle asked for relief from the district court simply because. Can I just reaffirm, it seems to me your actual answer is we don't care. No, Your Honor, we do care very much. And I do think it's a- Okay, then why? Your Honor, I think it is important to remember that if, and perhaps at any point, this is an ongoing program. There were about 300, and excuse me, 33, about 3,300 opt-outs from the class, meaning that more than 99.5% of the class accepted the settlement. You're afraid that somebody else is gonna show up tomorrow and say. I do not think people can say, I did not understand my rights, please let me opt out now. I do not think that is a structure that we should endorse. And I think it is exactly what the district court was trying to prevent from happening here. But one could certainly cabinet. She did it pretty soon, very soon, right? In other words, if somebody was to show up now, we just say forget it. But she does have a story about why this happened and the fact that she opted out within a couple of weeks, right? Your Honor, the opt-out date was September 16. I believe she asked for, she requested to have a second chance to be let out of the settlement on October 17. It was about 30 days. I accept that that is not an incredible amount of time. However, I do think there is, the court has, is given exceptional discretion to manage the class. I think the- Yeah, but the district judge didn't say much. I mean, there are various considerations that are equitable considerations and so on, but as I read the district court's order on that one, he just says, you're late, too bad, bye. Yeah, I think it's important to go back to Ms. Partle's affidavit, if you're looking for whether or not there was good cause here or excusable neglect. What her affidavit says is that she received the court-approved notice, that she downloaded the long-form notice, that she sent it to her lawyers, reviewed it with her lawyers, and decided to opt out. The notice itself provides the mechanism for opting out, and that is mail to an independent claim supervisor. That is the only method of opting out of the class, and it is in plain language. And that, Ms. Partle says, I thought I could do it another way. What she never does is say why she thought she could do it another way. And there's certainly nothing that I am aware of that would have led her to think there was something that let her do it another way. But more importantly, I think it is important to remember that the court itself, who acted after reading this affidavit, was certainly aware of the contents of the long-form notice. Were claims made online? A claim can be made online, yes. That's obviously what she did. She made the claim, not the object. Correct. Well, I'm not gonna say correct because that's not in the record. Well, you could prove that, but it appears that's likely a lie. But what she is suggesting she did is she misunderstood, which nobody else claims they misunderstood, that she could, instead of mailing a letter to the independent claims supervisor, submit a claim for relief, and that would be seen as a valid opt-out. It's almost, respectfully, a little bit nonsensical, and I think the district court recognized that for what it was. Okay, thank you. Thank you. Now, you used your time. If either of you would like two minutes in rebuttal. May it please the court, and I'll use less than two minutes, but thank you. I don't hear any denial, nor was there any in the briefs, that Tori Pardo acted in good faith, even if she did it wrong. The idea is, again, cannot conflate the question of whether she did it wrong with whether she was acting in good faith, and that's part of the point. Is the test good faith? Yes, Your Honor. Excusable neglect, the test is good faith. Well, excusable neglect and good faith are not precisely the same thing. I thought, I mean, it certainly has an element of reasonableness. I mean, you can be in good faith and completely unreasonable. There's actually a number of elements that go into excusable neglect. They're laid out in the briefs. It's the pioneer factors, including danger of prejudice, length of delay. Good faith is one of them. Reason for the delay, potential impact on the proceedings, and they're all laid out in the briefing, so I didn't want to trouble this Court again with those. Well, there's the pioneer case, and then there's another case that's just about opt-outs, and they just seem to pass in the night a bit in terms of why there are two different standards operating here. I noticed that as well in the readings, Your Honor, and I can't speak to that other than I agree that there does seem to be two somewhat similar, but there's overlapping tests, but I think in the end, the test still remains the same. Ultimately, it's good faith, and whether there was really any prejudice here, but the only thing I wanted to come up here and say is, to the extent that this Court was- And whether it was a reasonable mistake. You don't think that's in there somewhere? I'm sorry, Your Honor? You don't think whether it's a reasonable mistake? I mean, suppose she had gone out in the street and thrown a piece of paper in the sky, and said, right? Of course, Your Honor, of course. I don't think I can deny that. I think there's lots of reasons why it was reasonable under the circumstances with the method of communication, but the only reason I wanted to come back up here, honestly, Your Honors, was to point out that to the extent that this Court believes that Tory Pardo, or any consumer, should have the right to control her own claims, given that she had this pre-existing lawsuit, that's, I think, ultimately the difference here between someone who just wants to opt out and take their own crack at it, versus in here with a long- But you've just been pretty much assured that there's not going to be a problem about the rest of the lawsuit. Yes, Your Honor. Okay. Thank you, Your Honors. Thank both sides for their arguments. The settlement case, with respect to Volkswagen, is now submitted.
judges: Tashima, W. Fletcher, Berzon